**ASSOCIATED VESSELS SERVICES, INC., and Stonavar Trading, Inc., Plaintiffs,**

v.

**C. William VERITY, Secretary of Commerce and J. Curtis Mack, II, Administrator and Under Secretary, National Oceanic and Atmospheric Administration, Defendants.**

**Civ. A. No. 86–3265.**

United States District Court, District of Columbia.

May 11, 1988.

---

Judith Bartnoff, Patton, Boggs & Blow, Washington, D.C., for plaintiffs.

Charles R. Shockey, Dept. of Justice, Washington, D.C. for defendants.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

This is a lawsuit brought by two corporations representing foreign interests who seek judicial relief from actions taken by the Secretary of Commerce and the Administrator of the National Oceanic and Atmospheric Administration ("NOAA") in regulating and managing Atlantic *Loligo* squid fisheries. Plaintiffs seek declaratory and injunctive relief from defendants' promulgation of final annual specifications for *Loligo* squid for 1986. Plaintiffs contend that defendants are not managing the Atlantic squid fishery in a manner consistent with the Magnuson Fishery Conservation and Management Act of 1976, as amended, 16 U.S.C. § 1801 *et seq.* ("Magnuson Act") and the applicable regulations, 50 C.F.R. Part 655.

Plaintiffs are two corporations which provide vessel support services, including fishing and management of boats, to Spanish vessels fishing for Atlantic *Loligo* squid. The core of plaintiffs' complaint is that the defendants unlawfully reduced foreign nations' rights to harvest *Loligo* squid. As a result of that reduction, plain-

tiffs claim that the Spanish lost their right to fish for Atlantic *Loligo* squid and that they, in turn, lost an important part of their demand for vessel support services.

Plaintiffs challenge defendants' 1986 final specifications for *Loligo* squid on two principal grounds.[1] First, they claim that the final 1986 regulations unlawfully overestimate the amount of squid that will be caught by domestic fisherpeople—and thereby almost completely cut the foreign fishing interests out of the domestic squid harvest. Second, plaintiffs urge that defendants' final 1986 specifications force the Secretary of State to violate certain agreements he made to permit foreign nations to harvest *Loligo* squid pursuant to certain "purchase ratios." Plaintiffs claim that these purchase ratios function to create rights to fish for foreigners based on their purchases of domestically harvested and/or processed squid.[2] They have moved for summary judgment and a variety of remedies—including measures that would involve this court in the allocation of fishing rights to foreign interests, a function Congress delegated exclusively to the Secretary of State.

Defendants oppose plaintiffs' motion for summary judgment and ask me to dismiss this case. In addition to defending the regulations challenged on the merits, defendants raise a number of jurisdictional barriers to plaintiffs' right to obtain the relief they seek from this court.

I have decided to deny plaintiffs' claim and will dismiss this case. My decision is based largely on the fact that Congress did not intend to create a cause of action on behalf of foreign fishing interests to challenge allocations of TALFF made by the Secretary of State in cooperation with the Secretary of Commerce.

1. Plaintiffs raise a litany of other complaints—including the assertion that defendants failed to "use the best scientific evidence available" in calculating the final 1986 Loligo squid specifications (particularly the estimated domestic harvest), but the heart of their complaint focusses on their lack of access to the *Loligo* squid fishery.

2. The policy which has led to the establishment of these purchase ratios is popularly known as

the "fish and chips" policy. Apparently in an attempt to encourage foreign purchases of domestically harvested *Loligo* squid, the Secretary of State offers certain benefits to foreign countries in return for purchases of domestic product. The exact nature of this arrangement—namely whether the Secretary confers "rights" or merely "preferences" on foreign fishing interests is a central issue in this case and is discussed more fully below.

## A. *The Act*

The Fishery Conservation and Management Act, enacted by Congress in 1976, declares, in part, that:

A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, and to realize the full potential of the Nation's fishery resources.

A national program for the development of fisheries which are underutilized or not utilized by the United States fishing industry ... is necessary to assure that our citizens benefit from the employment, food supply and revenue which could be generated thereby.

16 U.S.C. § 1801 ("findings") (6) and (7). Congress also made explicit its concern that:

Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade. The activities of massive foreign fishing fleets in waters adjacent to such coastal areas have contributed to such damage, interfered with domestic fishing efforts, and caused destruction of the fishing gear of United States fishermen.

16 U.S.C. § 1801 ("findings") (3). Congress, in short, enacted the Magnuson Act to protect American fishery resources and to help promote the American fishing industry.

In order to achieve these goals, Congress established a two hundred mile fishery conservation zone around the United States within which fishing by foreign vessels is prohibited, except as authorized by the Act. *See* 16 U.S.C. §§ 1811 and 1812. The Act also established Regional Fishery Management Councils, comprised of federal and state appointees, which are responsible, with the participation of the domestic fishing industry and other interested groups, for preparing, monitoring and revising fishery management plans for the species within its geographical area. 16 U.S.C. § 1801(b)(5); 16 U.S.C. § 1852.[3] The Mid-Atlantic Regional Council has prime responsibility for preparing and monitoring the management plan for *Loligo* squid.[4] The Councils submit these fishery management plans to the Secretary of Commerce, who is charged under the Magnuson Act with reviewing the plans to make sure they are consistent with the national standards,[5] other provisions of the Magnuson Act and other applicable law. 16 U.S.C. § 1854(a)(1)(A). The Secretary is also required to publish proposed plans or amendments in the Federal Register and to consider public comment. 16 U.S.C. §§ 1854(a)(1)(B); (a)(2)(A). The Act makes no provision for judicial review of either the fishery management plans or amendments.[6]

Once the Secretary of Commerce has approved a plan or an amendment, 16 U.S.C. § 1854(b)(1), he is responsible for its implementation. Regional Councils submit proposed implementing regulations to the Secretary, together with their proposed fishery management plan or amendment. The Secretary of Commerce is then required to review the proposed regulations, make any changes he believes may be necessary, and publish the proposed regulations in the

---

3. Pursuant to the directives of the Act, the Regional Councils are made up wholly of representatives of domestic fishing interests—there is no place set aside for foreign representation on the Councils.

4. Although Atlantic mackerel, squid and butterfish are found within the territorial jurisdiction of both the New England and the Mid–Atlantic Councils, the Mid–Atlantic Council has prime responsibility for developing fishery management plans for those fisheries. *See generally* 50 C.F.R. Part 655; Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 4.

5. *See* 16 U.S.C. § 1851.

6. *But see Washington Trollers Association v. Kreps*, 466 F.Supp. 309 (W.D.Wash.1979) (Schwarzer, J.) (finding fishery management plans and amendments subject to same limited judicial review as implementing regulations because "the existence of a plan conforming to the statutory prerequisites is a condition to the Secretary's authority to promulgate regulations").

Federal Register for public comment. 16 U.S.C. § 1854(a)(1)(C). Following the comment period, and after considering any relevant concerns, the Secretary may promulgate regulations. 16 U.S.C. § 1855(a)–(c).

■ The Magnuson Act provides for very limited judicial review of the Secretary's promulgation of these implementing regulations:

> Regulations promulgated by the Secretary under this chapter [the Magnuson Act] shall be subject to judicial review to the extent authorized by, and in accordance with, Chapter 7 of Title 5 [of the United States Code], if a petition for review is filed within 30 days after the date on which the regulations are promulgated; except that (1) section 705 of such title is not applicable, and (2) the appropriate court shall only set aside any such regulation on a ground specified in Section 706(2)(A), (B), (C) or (D) of such title.

16 U.S.C. § 1854(b)(1). In so providing, Congress explicitly barred the use of the more stringent "substantial evidence" standard of review. *See generally Washington Trollers Association v. Kreps,* 466 F.Supp. 309, 312 (W.D.Wash.1979), *rev'd on other grounds,* 645 F.2d 684 (9th Cir. 1981). Thus, Congress vested the Secretary with broad discretion in promulgating regulations to implement the fishery management plan, and permitted courts to only consider "whether this discretion was exercised rationally and consistently with the standards set by Congress." *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977); *Louisiana v. Baldrige,* 538 F.Supp. 625, 628 (E.D.La.1982).

This case involves a challenge to the final regulations promulgated for *Loligo* squid in 1986.[7] Although plaintiffs do not challenge the lawfulness of the fishery and

management plan which forms the framework for the challenged final specifications for *Loligo* squid, it is to that plan and the national standards which we now must turn.

### B. The Regulatory Framework for Loligo Squid

The Act requires that any fishery management plan or amendment prepared by either the Regional Fishery Management Councils or the Secretary of Commerce, and any regulations issued to implement a fishery plan or amendment, must be consistent with seven national standards. 16 U.S.C. § 1801; *See also* 50 C.F.R. Part 602.

#### 1. The Fishery Management Plan—An Overview

a. Optimum Yield ("OY") and Maximum Sustainable Yield ("MSY").

One of the principal purposes of the Magnuson Act is "to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the *optimum yield* from each fishery ..." 16 U.S.C. § 1801(b)(4) (emphasis added). In accordance with that purpose, each fishery management plan is required to "assess and specify the present and probable future condition of, and the *maximum sustainable yield* and *optimum yield* from, the fishery ..." 16 U.S.C. § 1853(a)(3) (emphasis added).

According to the regulations, the maximum sustainable yield ("MSY") is "the largest average annual catch or yield that can be taken over a period of time from each stock under prevailing ecological and environmental conditions."[8] 50 C.F.R. § 602.11(c)(1).

---

7. Plaintiffs do not challenge the consistency of the *Loligo* squid fishery and management plan with the national standards set forth in the Magnuson Act.

8. The regulations further provide that the MSY should be based on the "best scientific evidence available" and that the "MSY may only be the starting point in providing a realistic biological description of allowable fishery removals." 50

C.F.R. § 602.11(c)(3) and (4). For instance, the MSY may be adjusted because of environmental factors, stock peculiarities or other factors, prior to the determination of the OY. *Id.* The concept of "allowable biological catch" ("ABC") has been employed in the management of the *Loligo* squid fishery to reduce the MSY. *See infra.*

The optimum yield from a fishery is the amount of fish:

(A) which will provide the greatest overall benefit to the Nation, with particular reference to food production and recreational opportunities; and

(B) which is prescribed as such on the basis of the maximum sustainable yield from such fishery, *as modified by any relevant economic, social, or ecological factor.*

16 U.S.C. § 1802(18) (emphasis added). The regulations mandate that the process of determining the OY must include the consideration of the following nine factors:

(1) total world export potential by squid-producing countries;

(2) total world import demand by squid-consuming countries;

(3) U.S. export potential based on expected U.S. harvests, expected U.S. consumption, relative prices, exchange rates, and foreign trade barriers;

(4) increased or decreased revenues to the U.S. from foreign fees;

(5) increased or decreased revenues to U.S. harvesters (with or without joint ventures);

(6) increased or decreased revenues to U.S. processors and exporters;

(7) increases or decreases in U.S. harvesting productivity due to decrease or increase in foreign harvest;

(8) increases or decreases in U.S. processing productivity; and

(9) potential impact of increased or decreased TALFF [total allowable level of foreign fishing] on foreign purchases of U.S. products and services and U.S. caught fish, changes in trade barriers, technology transfer and other considerations.

50 C.F.R. § 655.21(b)(1)(ii)(A)–(I). Whereas the determination of the MSY is essentially a scientific process, the process of determining the OY is designed to provide the Secretary of Commerce with a great deal of discretion. He is explicitly required to consider the economic needs of the domestic fishing industry and is directed to give special scrutiny to the potential impact of foreign fishing on domestic interests.

b. Domestic Annual Harvest ("DAH") and Total Allowable Level of Foreign Fishing ("TALFF").

In addition to establishing the MSY and the OY, each fishery management plan is also required to assess and specify the following:

the "capacity and extent" to which "fishing vessels of the United States, on an annual basis, will harvest the optimum yield." 16 U.S.C. § 1853(a)(4)(A) ("DAH");

the portion of the optimum yield, which on an annual basis "will not be harvested by fishing vessels of the United States and can be made available for foreign fishing." 16 U.S.C. § 1853(a)(4)(B) ("TALFF"); and

the "capacity and extent" to which domestic U.S. fish processors on an annual basis "will process the portion of the optimum yield that will be harvested by U.S. fishing vessels." 16 U.S.C. § 1853(a)(4)(C) ("DAP").

The capacity and extent to which domestic fisherpeople "will harvest" fish (in this case *Loligo* squid) is known as the "domestic annual harvest" ("DAH").

The part of the optimum yield which "will not be harvested" by domestic fisherpeople is known as the "total allowable level of foreign fishing" ("TALFF"). The Secretary of State, acting in cooperation with the Secretary of Commerce, "may" but is not required to, allocate TALFF to foreign nations. 16 U.S.C. § 1821(d)(4), (e)(1)(A). Foreign nations which receive allocations of TALFF may then distribute those fishing rights to their own fishing interests in whatever manner they deem appropriate. In other words, an allocation of TALFF can roughly be conceptualized as giving out tickets which can be used by foreign nations' fisherpeople to fish in the Fishery Conservation Zone—neither foreign nations nor their fisherpeople need necessarily utilize these permissive fishing rights upon their receipt. DAH + TALFF = OY

The capacity and extent to which the domestic harvest will be processed by U.S.

fish processors is the level of domestic annual processing ("DAP"). That portion of the DAH that "will not be processed" by United States processors may be made available for purchase by foreign nations directly in what are called "over the side transfers" from domestic fishing vessels. The amount of fish that is available for processing by these "joint ventures" is specified as joint venture processing ("JVP"). DAP + JVP = DHA

The Councils are required to "review on a continuing basis and revise as appropriate" their assessments and specifications of OY, DAP and TALFF. 18 U.S.C. § 1852(h)(5). The final responsibility for adjusting the specifications, however, belongs to the Secretary of Commerce. All of the specifications—both at the initial and the review stages of the process—must be based on the "best scientific evidence available." 16 U.S.C. §§ 1801(c)(3); 1851(a)(2)[9]

### 2. *Management of the Loligo Squid Fishery*

The regulatory framework for conservation and management of the *Loligo* squid fishery is set forth at 50 C.F.R. Part 655, which contains the regulations implementing the Fishery Management Plan for the Atlantic Mackerel, Squid and Butterfish fisheries. The applicable regulations closely parallel the national guidelines for fishery management plans set forth above, except for the passage of two amendments.[10]

Amendment No. 1 permits the optimum yield to be adjusted annually and throughout the fishing year. The Amendment is designed to provide fishery management officials with flexibility to account for unforeseen circumstances and to promote the growth of the domestic commercial squid industry. The amendment:

... allows for adjustments to be made due to changes in seasonal availability of squid; changes in fishing patterns or practices of U.S. fishermen fishing for more economically viable species of fish; increases in TALFF to reward foreign nations providing markets for U.S. exporters; joint venture operations and changes to approved joint ventures; or for other benefits. This mechanism both fosters the "fish and chips" policy and the Magnuson Act and establishes a mechanism to achieve maximum utilization of the OY for squid.

Amendment No. 1, Administrative Record 1 at 3. Amendment No. 1 established the following mechanism for setting and revising annual specifications for *Loligo* squid:

The maximum sustainable yield (MSY) for any fishing year is 44,000 metric tons ("mt"). 50 C.F.R. § 655.21(a).[11] After a review of the most recent and best available biological data, the allowable biological catch ("ABC") for that year is established. 50 C.F.R. 655.21(b)(1)(i). The ABC is a modification of the maximum sustainable yield which reflects the fact that the stock of *Loligo* squid for that particular year may not support a full 44,000 mt harvest. *Id.*

Fishery management officials then determine the initial optimum yield ("IOY") for the fishing year. The IOY is established at a level "that will produce the greatest overall net benefit to the United States." 50 C.F.R. § 655.21(b)(1)(iv). The IOY represents a modification of the ABC, based on the nine economic factors enumerated at 50 C.F.R. § 655.21(b)(1)(ii)(A)–(I). *See supra* at 18. These factors include, *inter alia,* increased or decreased revenues to U.S. harvesters (with or without joint ventures) and increases or decreases in U.S. harvesting productivity due to decrease or increase in foreign harvest. Because of the breadth and the nature of the factors they must take into account, fishery management

---

**9.** The national standards and the guidelines for fishery management plans are discussed in greater detail in the Commerce Department regulations which implement the Magnuson Act. *See generally* 50 C.F.R. Part 602.

**10.** Plaintiffs do not challenge the validity of these two amendments. On their face, they are consistent with the national guidelines.

**11.** The maximum sustainable yield is the scientific estimate of the upper limit for the harvest of a given species which can be taken consistently, year after year, without diminishing the stock. *See State of Maine v. Kreps,* 563 F.2d 1043 (1st Cir.1977).

officials and the Secretary of Commerce have a great deal of discretion in establishing the IOY. The level of IOY must, however, provide for a TALFF sufficient to permit a minimum incidental catch, or bycatch, of *Loligo* squid necessary to pursue other directed fisheries.[12] 50 C.F.R. § 655.21(b)(1)(iv).

Once the IOY has been established, fishery management officials specify the domestic annual harvest (DAH) and its two components, domestic annual processing (DAP) and joint venture processing (JVP). The DAH is estimated, based on the best scientific evidence available, to reflect the capacity and extent to which the domestic industry will harvest the IOY. Pursuant to Amendment No. 1, initial DAH specifications are based on a review of past landings and catch statistics, stock assessments, results of surveys of processors to determine their capacity and intent to process *Loligo* squid, and results of surveys of fisherpeople's associations to determine their capacity and intent to harvest *Loligo* squid. 50 C.F.R. §§ 655.22(e); 655.-21(b)(1)(iv).

The IOY may be adjusted throughout the fishing year whenever appropriate to achieve the greatest benefit for the United States and the domestic fishing industry. The IOY may not, however, ever be adjusted upward beyond the ABC, nor may it be decreased below bycatch levels or to a level that would cause TALFF to be reduced below the amount that has already been allocated to and accepted by foreign nations. 50 C.F.R. § 655.21(b)(1)(v).

The second amendment changed the beginning of the fishing year from April 1 of each year to January 1. Amendment No. 2 implemented in March, 1986. As a result, 1986 was a nine month transitional fishing year.[13]

## C. *Plaintiffs' Claims*

Plaintiffs raise two related charges against defendants' management of the *Lo-*

*ligo* squid fishery during the 1986 fishing year.

Plaintiffs claim that the DAH and the DAP were established at levels far higher than those that reasonably were projected to be harvested by United States fisherpeople or processed by domestic processors. Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment at 23. They claim that the DAP and DAH levels were knowingly inflated and that the specifications therefore failed to comply with the requirements of either the Magnuson Act or the *Loligo* squid fishery management plan. *See* 16 U.S.C. § 1853(a)(4)(A) and (C) and 50 C.F.R. § 655.21(b)(1)(iii). Plaintiffs further claim that defendants "exacerbated their illegal actions in establishing the initial *Loligo* specifications by failing to make any corrective adjustments in DAH and DAP, based on the actual levels of *Loligo* harvested during the year." Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment at 24. As a result of defendants' allegedly unlawful actions, plaintiffs contend that TALFF was greatly understated. They further claim that, "[t]he underspecification of TALFF in 1986 resulted in economic injury to plaintiffs, whose businesses depend on participation by foreign nations, particularly Spain, in the *Loligo* fishery." *Id.* at 26. Plaintiffs, not only charge that defendants have illegally manipulated the *Loligo* squid specifications in 1986, but also claim that there has been a pattern of unlawful manipulation since 1982.

Plaintiffs' second claim is that the understatement of TALFF in 1986 prevented the Secretary of State from fulfilling certain agreements to permit foreign fishing. These agreements were designed to encourage foreign imports of American *Loligo* squid. They reward foreign nations for purchasing U.S. harvested squid by provid-

---

**12.** The "bycatch" is the level of fish, in this case *Loligo* squid, which is inevitably caught when fishing for other species. Defendants' Brief at 10, n. 4.

**13.** The specifications for the nine month year were prorated.

ing those nations with certain advantages in obtaining TALFF.[14] According to plaintiffs:

> The essence of plaintiffs' claim for relief is that the Spanish (with whom plaintiffs have business relationships relating to *Loligo* squid) *were induced* to import *Loligo* from the United States, in accordance with purchase ratios established by defendants, in order to "earn" TALFF allocations. Defendants' manipulation of the specifications then precluded the Spanish from receiving all of the TALFF they had earned.

Plaintiffs' Memorandum to the Court at 5–6.

In response to plaintiffs' allegations, defendants offer what amounts to two defenses. First, defendants contend that the estimates of DAH and DAP are fair and accurate. In support of this explanation, defendants offer evidence about the domestic industry's capacity and intent to harvest and process *Loligo* squid. They also provide a technical account of why squid is not available to be caught in commercial quantities.

A second aspect of defendants' contention that the estimates are fair and accurate centers on their right to rely on the annual surveys of the domestic industry's capacity and intent to harvest and process *Loligo* squid. Defendants assert that:

> The crux of plaintiffs' motion and their supporting memorandum relates to one fundamental disagreement on their part with the manner in which the defendants determined the specifications for the *Loligo* squid fishery. That disagreement, stated simply, is whether the Secretary properly may rely on the results of surveys of domestic squid harvesters and processors as an important factor in estimating their capacity and intent to catch as much *Loligo* as possible, as we believe, or whether the Secretary must base his estimates of future harvest lev-

els solely on actual catch statistics from past years, as plaintiffs believe.

Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment at 2–3. Defendants are required by law to consider both past catch figures, 50 C.F.R. 655.22(e)(3); 50 C.F.R. 655.21(b)(1)(iii), *and* the survey results of domestic harvesters and processors concerning their capacity and intent to catch and process *Loligo* squid. 50 C.F.R. 655.22(e)(1), (2); 50 C.F.R. 655.21(b)(1)(iii).

Defendants' second defense for the gap between the final specifications for DAH and DAP strikes at plaintiffs' interpretation of the legal requirements of the Magnuson Act and the fishery management plan. Defendants argue that plaintiffs have misunderstood the role of the Secretary of Commerce in establishing DAH. Whereas plaintiffs contend that the process of determining the DAH specification is mandated by the statute and the regulations to be fundamentally predictive, defendants believe that when he is setting the DAH, the Secretary of Commerce has the discretion not only to estimate the domestic harvest, but also to take into account economic policy concerns. The defendants assert that:

> ... plaintiffs claim that the Secretary cannot consider economic factors in setting DAH and DAP specifications, even though he is required to do so in setting OY. This claim is spurious on its face. OY is equal to the sum of DAH and TALFF. OY represents that level of catch that is in the "greatest overall benefit" of the United States. Certainly, if OY is based to a large part on economic considerations, its two component parts, DAH and TALFF, may reflect economic considerations as well ... DAH and DAP are not figures that can be estimated in an economic vacuum as plaintiffs apparently suppose.

Defendants' Reply to Plaintiffs' Opposition to Motion to Dismiss or, in the Alternative,

---

14. These agreements, or purchase ratios, are called the "fish and chips" policy. Purchases of U.S. harvested squid are the "chips" which provide foreign nations with a priority interest in obtaining whatever TALFF is allocated by the Secretary of State. *See* 16 U.S.C. § 1821(e)(1)(E)(ii) (requiring that the Secretary of State's allocations of TALFF shall be based, in part, on purchases made by foreign nations).

for Summary Judgment at 14–15. Defendants therefore characterize both the DAH and the OY specification setting processes as properly involving policy considerations.

### D. *Plaintiffs Did Not "Earn" an Entitlement to Foreign Fishing Rights by Purchasing Domestic Loligo Squid*

What plaintiffs have termed the "fish and chips" policy is a system of purchase ratios established by the Secretary of Commerce and the fishery management officials to encourage foreign purchases of domestically harvested and/or processed *Loligo* squid. The fish and chips policy reflects the statutory directive of the Magnuson Act that the Secretary of State take into consideration when making allocations of TALFF to foreign nations:

> (ii) whether, and to what extent, such nation is cooperating with the United States in both the advancement of existing and new opportunities for fisheries exports from the United States through the purchase of fishery products from United States processors, and the advancement of fisheries trade through the purchase of fish and fishery products from United States fishermen, particularly fish and fishery products for which the foreign nation has requested an allocation.

16 U.S.C. § 1832(e)(1)(E)(ii). Purchases of domestic product is therefore one of several factors the Secretary of State takes into consideration when making allocations of TALFF.[15]

Pursuant to this statutory directive that the Secretary of State take foreign purchases of domestic product into account when allocating TALFF, the managers of the *Loligo* squid fishery established purchase ratios. The system is designed so that each purchase of domestic squid provides the foreign purchaser with a corresponding preference in the competition between foreign nations for allocation of TALFF for *Loligo* squid. In other words, if a foreign nation purchased a metric ton of domestic *Loligo* squid, fishery management officials promised the purchaser that they would recommend to the Secretary of State that he make a related allocation of fishing rights in the *Loligo* squid fishery.[16] The purchase ratios thereby served to encourage foreign purchases of domestic product and at the same time provided the Secretary of State with a meaningful and quantitative guide for allocating TALFF. The administrative record plainly reflects that foreign purchases of domestic *Loligo* squid were encouraged by the use of these purchase ratios.

At the end of the 1986 fishing year, there was a shortfall of TALFF relative to the preferences earned by foreign nations' purchases of domestic *Loligo* pursuant to the purchase ratios. As a result of this shortfall, plaintiffs make two related complaints about defendants' management of the purchase ratios.

■ Plaintiffs' first claim is that a foreign nation's purchase of domestic *Loligo* squid, by virtue of the Commerce Department's fish and chips policy, "earned" that nation an "entitlement" to an allocation of TALFF. Plaintiffs argue, in relevant part:

> Those [purchase] ratios were intended by the Council, when they were proposed, as a mechanism for foreign nations to earn TALFF. Spain purchased U.S. harvested squid in reliance on those ratios. As of

---

**15.** The Secretary of State is also directed to consider, among other items: (i) the extent the foreign nation imposes tariff barriers or otherwise restricts market access of American fishery products, particularly fish and fishery products for which the foreign nation has requested an allocation; (iii) the cooperation of the foreign nation's fleet in the enforcement of United States fishing regulations; (iv) whether the foreign nation requires the fish for its own domestic consumption; and (viii) such other matters as the Secretary of State, in cooperation with the Secretary [of Commerce], deems appropriate. *See generally* 16 U.S.C. § 1821(e)(1)(e)(E)(i)–(viii).

**16.** For the 1986 fishing year, the initial purchase ratio was 1.0 mt TALFF for each 1.0 mt purchase. The final ratio was 1.5 mt TALFF for each 1.0 mt purchased. Foreign nations received credit for 1.0 mt TALFF for each 2.0 mt of United States harvested squid purchased prior to processing ("over the side") for joint venture processing. *See generally* Administrative Record 76, 83 and 92.

October 10, 1986 Spain had purchased nearly 2,000 mt of U.S. shoreside processed *Loligo* and an additional 350 mt over-the-side. Italy also made substantial purchases in reliance on the ratios. Even the final purchase ratios established for 1986 could not have been wholly satisfied from the 3,000 mt of TALFF in the final 1986 *Loligo* specifications. That 3,000 mt would barely satisfy the ratio for Spanish shoreside purchases alone.

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 27. Plaintiffs' assertions ignore the structure of the Magnuson Act and exaggerate the importance of the purchase ratios in the allocation process. There is no statutory entitlement to TALFF.[17] The statute plainly provides that allocations are made at the discretion of the Secretary of State.[18] Furthermore, as thoroughly informed and involved participants in the regulatory process, plaintiffs were fully aware that any releases of TALFF by the Secretary of Commerce to satisfy the purchase ratios would be subject to the availability of squid and the Secretary of Commerce's specifications for DAH and OY.[19]

The heart of plaintiffs' second complaint about the purchase ratios is that:

it is arbitrary and capricious for defendants to establish ratios that *cannot* be met because foreign purchases have exceeded the available TALFF, when the TALFF is not available because the specifications have been unlawfully manipulated by overstating DAH. But for that unlawful manipulation, the TALFF would have been available, to the extent of the difference between OY and DAH.

Plaintiffs' Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment at 16. This complaint

about the purchase ratios is essentially a recounting of plaintiffs' primary challenge to the *Loligo* squid specifications for 1986 —that the defendants failed to establish a realistic DAH. *See supra.*

### E. The Remedies Plaintiffs Seek, The Identity of the Plaintiffs and Justiciability Concerns

Although the plaintiffs have identified certain concerns with the methodology used by the Secretary of Commerce to specify the levels of DAH and TALFF in fishing year 1986, I conclude that they are not entitled to relief.

#### 1. The Relief Plaintiffs Seek

■ It is unclear what relief plaintiffs seek. In their Complaint, plaintiffs ask the court to issue a declaratory judgment that the 1986 *Loligo* squid specifications are arbitrary and capricious because they overstate DAH; to issue a declaratory judgment that the actions of defendants in establishing the 1986 specifications are arbitrary and capricious; to issue a declaratory judgment that the actions of defendants in establishing purchase ratios for *Loligo* squid without adjusting TALFF to levels sufficient to meet those ratios are arbitrary and capricious; and to permanently enjoin defendants from establishing annual specifications for *Loligo* squid in contravention of the Magnuson Act and the applicable regulations. The relief plaintiffs sought in their Complaint has in large part, and perhaps completely, been mooted by the subsequent course of events. In particular, the issuance of the requested declaratory judgments would be an empty act because such declarations would deal with fishing years already closed. *See generally* Defendants' Summary Judgment Memorandum at 23–26; Defendants' Notice of Recent Develop-

---

17. In their later briefs, plaintiffs back away from their initial claim that the purchase ratios create entitlements to allocations of TALFF. *See e.g.* Plaintiffs' Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment at 15–16 ("Plaintiffs recognize that the purchase ratios do not create any entitlement to a TALFF allocation for a particular foreign nation.").

18. *See infra.*

19. *See* Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment at 43; *see also* Administrative Record 40 at 71–89.

**24**

ment at 1; Defendants' Response to Plaintiffs' Memorandum to the Court at 5–6.

Perhaps recognizing the weakness of their initial position on the issue of relief, plaintiffs altered their request in the middle of this litigation. In the conclusion of their Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Summary Judgment Memorandum"), and again in their attached "Proposed Order," plaintiffs sought three specific forms of relief—which taken together are significantly different from their initial request. First they ask me to order defendants to "increase the allocation of TALFF for *Loligo* squid in fishing year 1987 by the amount which the DAH for fishing year 1986 exceeded the amount of *Loligo* squid harvested in that fishing year by the United States fishing industry." *See* Plaintiffs' Proposed Order at 1; *see also* plaintiffs' Summary Judgment Memorandum. Plaintiffs' second request is that I order the Secretary of State to allocate TALFF to foreign nations "so as to satisfy at a minimum, the purchase ratios established by defendants for fishing year 1986.-" *Id.* Finally, they ask me to order defendants to revise *Loligo* specifications for 1987 "to reflect realistic DAH and DAP levels that represent the amount of *Loligo* that will be harvested and processed by the U.S. industry based on the best available scientific evidence." *Id.*

Despite this reformulation, it appears that much, and perhaps all, of the relief sought by plaintiffs has been mooted. However, since plaintiffs either could have sought to further amend their complaint in this case or may bring a new lawsuit to seek similar relief, I shall address the three new forms of relief which they seek—notwithstanding the fact that they have not amended their complaint to encompass the current fishing year's TALFF requirements. I am doing this so that the parties can understand the basis of my decision and to instruct the plaintiffs in the event

that they consider bringing another lawsuit to encompass future years.[20]

**2. The Magnuson Act Reserves the Allocation of TALFF to the Secretary of State's Discretion**

■ Plaintiffs' second form of relief must be denied because the Magnuson Act explicitly reserves the function of allocating TALFF to the Secretary of State, acting with the cooperation of the Secretary of Commerce. The Magnuson Act as originally enacted vested considerable authority in the Secretary of State to allocate fishing rights to foreign nations. *See generally* "The Fishery Conservation and Management Act of 1976," P.L. 94–265, Title II. The Senate Conference Report provided, in relevant part, that:

... fishing by foreign nations is limited to that portion of the optimum yield of any fishery subject to fishery management authority of the United States which will not be harvested by the United States ... Within the total allowable level of foreign fishing in any fishery, allocations must be made among the various foreign nations interested in such fishing. Section 201(c) provides that the Secretary of State, in cooperation with the Secretary of Commerce, *shall allocate*, among foreign nations, the total allowable catch for foreign nations on the basis of traditional fishing and other specified factors.

*See* S.Rep. 94–711 at 44–45 (1976), U.S. Code & Admin.News 1976, pp. 593, 667–69 (emphasis added). The original Act, therefore, required the Secretary of State to distribute *all* of the available foreign fishing rights—but gave him broad discretion in deciding how to allocate those rights. Section 201(e)(1)(A) of the original Magnuson Act was amended by Congress in 1984 to give the Secretary of State discretion whether or not to make allocations of TALFF to foreign nations. The relevant statutory language now reads:

---

**20.** It should be noted, in this regard, that the likelihood of plaintiffs seeking the first and third forms of relief in the future apparently has been minimized by the Secretary of Commerce's decision to reform the methodology employed to calculate the DAH and hence TALFF. *See generally* Defendants' Response to Plaintiffs' Memorandum to the Court. *But see* Plaintiffs' Memorandum to the Court.

The Secretary of State, in cooperation with the Secretary [of Commerce], *may* make allocations to foreign nations from the total allowable level of foreign fishing which is permitted with respect to each fishery subject to the exclusive fishery management authority of the United States.

16 U.S.C. § 1821(e)(1)(A) (emphasis added). The amendment replaced the term "shall determine the allocation among foreign nations of" with the term "may make allocations to foreign nations from." *See* Pub.L. 98–623, § 404(1), § 402(2). In making this amendment, Congress clearly intended to provide the Secretary of State with the authority *not* to allocate TALFF in addition to the authority he already possessed to distribute TALFF in the manner he determined to be appropriate. As the defendants accurately point out:

> The purpose of these amendments is evident from the language of the statute itself. Congress provided the Secretary of State with discretion to award, or not award, TALFF, based on his assessment of how that nation was cooperating with efforts to develop our domestic fisheries and otherwise comply with the Act.

Defendants' Memorandum in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment at 40. Prior to the amendment, the plain language of the statute required the Secretary of State to distribute all the TALFF made available by the Secretary of Commerce, and provided him with only the more limited authority to decide *which* nations received allocations and the amounts they would receive.

The legislative history confirms this interpretation of Congress' intent in amending the Act. For instance, during the House floor debate following the Conference report, Rep. Jones (D–NC), Chairman of the House Merchant Marine and Fisheries Committee, emphasized that:

> The Fishery Conservation and Management Act, or the FCMA, would be amended to clarify that allocations of surplus fish to foreign nations from the U.S. fishery conservation zone are *dis-*

*cretionary and not mandatory.* In making an allocation the Secretary would be required to consider what steps a foreign nation has taken to facilitate the sale of U.S. fish and fish products and in particular the importation of those species for which that country is seeking an allocation.

*See* 130 Cong.Rec. H11383 (1984) (emphasis added). Rep. Jones' statement was confirmed by Rep. Pritchard, the ranking minority member of the Committee, who asserted that "a full allocation of total allowable level of foreign fishing is not required by law. That is, the United States does not have to fully allocate the TALFF." *Id.* at 11384. The passage of the bill on the Senate side confirmed Congress' intent that the amendments provide the Secretary of State with more flexibility to achieve international trade benefits for the domestic fishing industry. For instance, Senator Gorton (R–Wash.) stated that the amendments were designed to "expand foreign trade opportunities for our American fishing industry and to ensure that our own fishing industry receives the maximum obtainable benefits whenever the Federal Government allocates surplus fish in our 200–mile zone to foreign nations." 130 Cong.Rec. S14013 (1984). Senator Gorton also noted that:

> Allocations of fish from our fishery conservation zone [FCZ] to foreign nations is not a right on which foreign nations should rely. It is a privilege—a privilege that is only conferred in return for cooperation on their part. To date, that cooperation has not been fully satisfactory..
>
> ... this section clarifies the Magnuson Act so that there is no doubt that allocations to a foreign nation occur when we are satisfied with that foreign nation's arrangements to purchase U.S. fish and fish products—and clarifies *that full allocation of the total allowable level of foreign fishing, or TALFF, is not required by law.*

*Id* (emphasis added).[21] Congress' intent in amending the Act is clear. No nation can have a right to TALFF.

---

**21.** Further confirmation that the Secretary of State possesses broad discretion in allocating

■ The regime established by the amended statute clearly commits to the Secretary of State's sound discretion the establishment of an appropriate amount of TALFF to allocate in each year. The Secretary of State's decision is not normally reviewable.[22]  Rather, the allocation of TALFF is a foreign policy decision which Congress has delegated to the Secretary of State, along with several clear, but general, guidelines for how to allocate the rights should he choose to distribute them. These guidelines, several of which have been enumerated above, require the Secretary of State to try to make allocations of TALFF in a manner that will benefit the domestic fishing industry and will improve the American fishing industry's opportunities to export fish and to fish in other countries' waters. *See generally* 16 U.S.C. § 1832(e)(1)(E)(i)–(viii). Aside from these broad guidelines, which may limit his discretion in *allocating* foreign fishing rights, the Secretary of State has been provided with broad discretion in *determining the actual amount* of rights to be distributed in each year.

Plaintiffs request this court to fashion a rough and ready allocation of fishing rights based on a foreign nation's purchases of domestically harvested and/or processed *Loligo* squid. But a foreign nation's purchases of domestic product is only one part of a complex formula that the Secretary of State uses to allocate these fishing rights. Only the Secretary of State can properly incorporate this factor into the delicate balance he must strike when allocating foreign fishing rights. Furthermore, the award of the right to fish in our waters is quintessentially a foreign policy function. This court has neither the expertise nor the authority to invade a policymaking province that has been explicitly delegated to the Secretary of State. In short, only the Secretary of State can allocate TALFF. As a result, this court will not provide plaintiffs with the second form of relief they seek.

3. Plaintiffs' Standing and the Separation of Powers Doctrine

For many of the same reasons that I decided not to interfere with the Secretary of State's allocation of TALFF, I have decided not to order the Secretary of Commerce to create TALFF (for the Secretary of State to allocate)—and therefore to deny plaintiffs the first and third forms of relief they seek. The fact that Congress has entrusted the Secretary of State with sole responsibility to allocate TALFF poses serious standing problems for these plaintiffs.

*Standing*

The Supreme Court has noted that "[t]he term 'standing' subsumes a blend of constitutional requirements and prudential considerations ..." *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). The Court summarized the constitutional requirements for standing when it stated that, as an "irreducible minimum," Article III requires a litigant invoking the authority of a federal court to demonstrate:

(1) "that he personally has suffered some actual or threatened injury as a

---

foreign fishing rights is found in the legislative history of the Fishery Conservation and Management Improvement Act of 1982. *See e.g.* H.Con.Rep. 97–982 at 15–16, U.S.Code Cong. & Admin.News 1982, pp. 4320, 4329, 4330; *see also* H.Rep. 97–549 at 21, U.S.Code Cong. & Admin. News 1982, pp. 4320, 4334 (discussing rationale for providing Secretary of State with greater discretion to withhold from foreign nations "excess" U.S. fishery resources).

**22.** The absence of meaningful standards for judicial review is particularly acute when the decision being scrutinized is a determination by the Secretary of State of whether or not to allocate an amount of TALFF. The amended statute simply provides no guidance or direction for making this threshhold determination. Plaintiffs in this case, of course, take issue with the actual level of TALFF, and implicitly are complaining about the actual level of fishing rights that have been distributed by the Secretary of State.

Although the statute provides somewhat more useful standards for reviewing the Secretary's actual allocational decisions between countries competing for the yearly amount of fishing rights to be allocated, plaintiffs have not contested the pattern of distribution of foreign fishing rights.

result of the putatively illegal conduct of the defendant," (injury in fact);

(2) "that the injury 'fairly can be traced to the challenged action' " (causation); and

(3) that the injury " 'is likely to be redressed by a favorable decision.' " (redressability)

*See Valley Forge, supra,* 454 U.S. at 472, 102 S.Ct. at 758. *See also Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); Tribe, *American Constitutional Law* (1987) at 107–109 (collecting and summarizing cases).

In addition to satisfying the constitutional requirements of injury in fact, causation and redressability, a litigant may be denied standing for prudential reasons. For instance, the Supreme Court has refrained from adjudicating " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Warth v. Seldin,* 422 U.S. at 499–500, 95 S.Ct. at 2206). The Court has also held that the " 'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Valley Forge,* 454 U.S. at 474, 102 S.Ct. at 760 (quoting *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205). Finally, the Court has required that "the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

This case involves both prudential and constitutional standing issues. The structure of the Magnuson Act—namely the Secretary of State's discretion whether to allocate TALFF—poses constitutional standing and separation of powers prob-

lems for these plaintiffs. Furthermore, the fact that plaintiffs are domestic corporations asserting the "rights" of a foreign country (Spain) creates prudential standing concerns.

### Separation of Powers

Supreme Court "standing jurisprudence" is rife with discussion of separation of powers principles. For example, the Court noted in *Allen v. Wright,* that:

... the case or controversy requirement defines with respect to the Judicial Branch the idea of *separation of powers* on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." ... More important, the law of Art. III standing is built on a single basic idea— *the idea of separation of powers* ...

... federal courts may exercise power only "in the last resort, and as a necessity," and only when adjudication is "consistent with a system of *separated powers* and the dispute is one traditionally thought to be capable of resolution through the judicial process."

*Allen v. Wright,* 468 U.S. 737, 750–752, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984) (citations omitted) (emphasis added); *see also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 497–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975); *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968).

■ This court cannot grant plaintiffs the relief which they seek without becoming enmeshed in the resolution of issues clearly committed by Congress to the Executive Branch. It is clear that the issues here are matters of foreign policy and are not for the court to adjudicate.

No matter which form of relief requested by plaintiffs is considered, action by this court would interfere with the orderly functioning of the dispute resolution process established by Congress when it

amended the Magnuson Act to give the Secretary of State greater discretion in allocating TALFF. Plainly, one of the chief goals of that amendment was to make foreign countries negotiate with the Secretary of State to obtain rights to fish in our waters. These plaintiffs, whether representing their own agency interests, or those derived from their Spanish principals, should not be permitted to "end run" this process.[23] Since the statute plainly commits the allocation of such rights to the Executive Branch, the plaintiffs must deal directly with the Secretary of State.

Granted, the problem which plaintiffs have identified has its locus at the Department of Commerce rather than at the State Department. However, plaintiffs paint a far too compartmentalized picture of how the TALFF-setting and allocation process works. The Act clearly establishes a process where both the Secretary of Commerce and the Secretary of State have broad discretion and are encouraged to work together in utilizing that discretion. Thus it is for plaintiffs to make their concerns known to the appropriate officials of the Executive Branch.

Furthermore, even if there were a dispute between the Secretary of State and the Secretary of Commerce, prudential considerations would dictate that I not try to

referee that dispute. The President certainly knows how to resolve conflicts between Executive departments.

*Redressability*

The causation and the redressability requirements of constitutional standing require the litigant to "establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that *prospective relief will remove the harm.*" *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975) (emphasis added). In other words, "when a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself *that is likely to be redressed by a favorable decision.*" *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (emphasis added).

Plaintiffs have asked this court, (in their first and third requests for relief), to order the Secretary of Commerce to increase the level of TALFF, in large part to enhance the ability of the Spanish to obtain the right to fish for *Loligo* squid in American waters.[24] It is for the Secretary of State, acting in cooperation with the Secretary of Commerce, to provide that right through his authority to allocate TALFF.[25]

---

23. Plaintiffs, who are domestic corporations, allude to the putative rights of others. For instance, plaintiffs wrote the following to an American fishery management official:

    Not only will these TALFF figures and ratios have adverse economic impact on our business, it will also have severe repercussions in the international relations between Spain and the United States with respect fishery matters. We expect these matters to be raised between these governments at the highest levels.

    As you are aware, Spain recently entered the EEC, where it will be a leader in establishing fisheries policy. *It is unwise as well as illegal to fail to recognize the legitimate right of the Spanish.*

    *See* Attachment 2 to Complaint for Declaratory and Injunctive Relief (Letter from Plaintiffs' attorney to Squid Fishery Management Official, October 10, 1986 at 5) (emphasis added). The fact that plaintiffs raise the possibility that the denial of TALFF will have international repercussions underlines the conclusion that this dis-

pute should be resolved by the Secretary of State.

24. Plaintiffs' ultimate objective is an increase in the use of their vessel support services by Spanish boats fishing for *Loligo* squid in American waters. Obviously, achievement of that goal depends on the occurrence of a number of events beyond the control of either the United States government or this court.

25. The triumvirate of Supreme Court cases that have become the touchstone for "redressability" or "causation" analysis, *Warth v. Seldin, Simon v. Eastern Kentucky Welfare Rights Organization* and *Allen v. Wright,* are cast principally in "causation" terminology. When the relief requested is merely the cessation of allegedly unlawful conduct, the causation and redressability components of the constitutional standing inquiry in practice perform similar functions. *See* Tribe, *American Constitutional Law* (1987) at 130, n. 6. As the Supreme Court has stated:

    The "fairly traceable" and "redressability" components of the constitutional standing in-

## Conclusion

For the foregoing reasons, defendants' motion to dismiss is hereby granted.

quiry were initially articulated by this Court as "two facets of a single causation requirement." To the extent there is a difference, it is that the former examine the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested. *Allen v. Wright,* 468 U.S. 737, 753, n. 19, 104 S.Ct. 3315, 3325, n. 19, 82 L.Ed.2d 556 (1984) (citation omitted). However, when the relief requested goes beyond the actual harm alleged, the two inquiries may diverge. Tribe, *American Constitutional Law* (1987) at 130. *See also Allen v. Wright,* 468 U.S. 737, 753, 104 S.Ct. 3315, 3325–26 ("Cases such as this, in which the relief requested goes well beyond the violation of law alleged, illustrate why it is important to keep the inquiries separate if the 'redressability' component is to focus on the requested relief.")

In this case, the harm, or injury, is completely "caused" once the Secretary of Commerce specifies a zero level of TALFF (other than by-catch requirements). In contrast, the redress of that harm requires more than merely the action of the Secretary of Commerce. Redress of the harm also requires action by the Secretary of State *and* further action by the Secretary of

Commerce (acting in a capacity different from his TALFF-setting role). As a result, the causation and the redressability inquiries are asymmetrical. That asymmetry is introduced by the role of the Secretary of State and the discretion he possesses over the TALFF allocation process and is compounded by the additional role played by the Secretary of Commerce. It is therefore insufficient for standing purposes for plaintiffs merely to show that the Secretary of Commerce may have *caused* their alleged harm; the focus of the inquiry is properly directed not only to the issue of causation but also toward the possibility of redress of the alleged harm.

The structure of the controversy before this court, therefore, does not provide any assurance that judicial relief from the Secretary of Commerce's alleged understatement of TALFF will remove the injury of which plaintiffs complain. *See Allen v. Wright,* 468 U.S. 737, 759, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 ("The links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain respondents' standing."); *Warth v. Seldin* (accord). The Secretary of State is ideally situated to achieve the objectives plaintiffs seek.