NATIONAL FISHERIES INSTITUTE,
INC, et al., Plaintiffs,

v.

Robert A. MOSBACHER, Secretary of
Commerce, Defendant,

and

Coastal Conservation Association,
Defendant–Intervenor.

Civ. A. No. 88–3103 (CRR).

United States District Court,
District of Columbia.

March 12, 1990.

Eldon V.C. Greenberg of Galloway & Greenberg, Washington, D.C., for plaintiffs.

Donald A. Carr, Acting Asst. Atty. Gen., and Charles R. Shockey, Dept. of Justice, with whom James C. Kilbourne, Washington, D.C., and Susan K. Auer and Karen R. Antrim, Dept. of Commerce, were on the briefs, for defendant.

Jeffrey R. Masi and Robert G. Hayes of Bogle & Gates, Washington, D.C., for defendant-intervenor.

## OPINION

CHARLES R. RICHEY, District Judge.

This is an Administrative Procedure Act ("APA"), 5 U.S.C. § 706, dispute over how the government should regulate the commercial and recreational harvest of certain billfish in the Atlantic Ocean. Representing commercial fishing interests, the plaintiffs challenge regulations issued by the Secretary of Commerce ("Secretary") pursuant to the Magnuson Fishery Conservation and Management Act ("Magnuson Act" or "Act"), 16 U.S.C. §§ 1801–82. These regulations have the effect of significantly reducing the domestic commercial harvest of Atlantic Ocean billfish while also limiting the recreational harvest to a lesser degree. The Court will uphold the challenged regulations because they do not exceed the scope of the Secretary's authority

under the Magnuson Act and are adequately supported by the administrative record.

## I. BACKGROUND

Under the Magnuson Act the federal government has "exclusive fishery management authority" to regulate fishing by foreign and domestic fishermen [1] within an area now called the "exclusive economic zone" ("EEZ"), which extends 200 miles out to sea from the seaward boundary of the coastal States. *See* 16 U.S.C. §§ 1811, 1802(6) (West Supp.1989). With one limited exception,[2] this authority extends to all fish, including billfish. For the purposes of this dispute, the term "billfish" comprises the blue marlin, white marlin, sailfish, and longbill spearfish species.

The parties agree that these billfish migrate over such great distances and are so widely distributed—both inside and outside the EEZ—throughout the Atlantic Ocean, the Gulf of Mexico, and the Caribbean Sea that commercial and recreational fishermen rarely encounter billfish. Consequently, specific biological and quantitative data regarding the billfish resource are relatively scarce compared with information available for most other species of fish regulated under the Magnuson Act.

More importantly, it is undisputed that within the EEZ the only directed fishing for billfish is by recreational fishermen using rod and reel gear. By contrast, commercial fishermen target other species, such as tuna or swordfish, and occasionally catch billfish as an incidental "bycatch" of their directed fishing activities.[3] Recreational fishing for billfish is apparently considered great sport, so much so that as early as 1982 "expenditures by participants in the fishery were estimated to be between $89 and $100 million." AR App. Vol. I, FMP Source Doc. at 3–3, 3–4;[4] *see also* AR App. Vol. I, Atlantic Billfish Fishery Management Plan ("FMP") at 33 (expenditures by participants in recreational billfish fishery estimated at $100 million in 1977–78). On the other hand, the estimated total ex-vessel value of billfish caught by longline fishermen in 1986 was $134,716, or far less than one percent of the catch by value for longline fishermen. AR App. Vol. I, FMP at 33–34; AR App. Vol. I, FMP Source Doc. at 8–15 & Table 8–4.

The Magnuson Act established eight Regional Fishery Management Councils ("Councils") composed largely of members representing the regions' coastal states. *See* 16 U.S.C. § 1852. In the normal course of events, each Council prepares a fishery management plan ("FMP") for each fishery within its jurisdiction that requires conservation and management, § 1853, and

---

**1.** The Court recognizes that not all individuals who engage in fishing, commercial or recreational, are men. Nevertheless, because the Court cannot think of a comparable gender-neutral expression that is both accurate and not unduly awkward, it will use the term "fishermen" throughout this Opinion to include all persons, whether male or female, who engage in fishing.

**2.** The Magnuson Act specifically precludes the federal government from asserting authority over "highly migratory species" of tuna. 16 U.S.C. §§ 1812 (West Supp.1989), 1802(14).

**3.** Commercial fishermen, who usually use "pelagic longline" gear or less frequently "drift net" gear to catch tuna and swordfish, sometimes discover that they have unintentionally hooked or entangled a billfish. It is estimated that 59% of the billfish caught by domestic longline fishermen are alive when brought on board. Administrative Record Appendix Volume I, Fishery Management Plan Source Document ("FMP Source Doc.") at 8–15 & Table 8–5.

The entire administrative record in this case is very extensive, consisting of forty-eight binders. The Secretary, with the agreement of all the parties, has also compiled and filed a four-volume "appendix" that contains all documents in the record that any of the parties have cited in their briefs. While it does not replace the entire administrative record, this appendix is a less cumbersome means of reviewing the relevant documents. Therefore, throughout the rest of this Opinion the Court will cite not to the entire 48–volume record but to the appendix using the following format: (i) if the document is in volume I (which designates documents by name)—AR App. Vol. I, _____ [document name] at ____ [page number] and (ii) if the document is in volumes II through IV (which designate documents by year and number)—AR App. Vol. ___, 19___. ___ [year/number] at ___ [page number].

**4.** For explanation of citation format see *supra* note 3.

then submits the FMP to the Secretary for approval, § 1854. The Secretary must evaluate the FMP for consistency with the Magnuson Act's seven national guidelines, § 1851(a)(1)–(7), and with any other applicable law, *see* § 1854(a)(1)(A). Once the Secretary approves the FMP, he or she implements it by promulgating regulations, § 1855(c), (g), which are subject to judicial review under the APA, § 1855(d).

However, the instant case was somewhat unusual due to the migratory nature of billfish. Since the Atlantic Ocean billfish fishery extends beyond the geographical authority of any one Council, the Secretary directed the five Atlantic Councils to jointly prepare an FMP for the Atlantic Ocean billfish resource, with the South Atlantic Council in the role of lead council.[5]

Without going into too much detail about the development of the billfish FMP at issue here, the Court can safely state—and the parties all agree—that this FMP has an exceedingly long history. In the beginning of 1978, the South Atlantic Council released a draft of the billfish FMP for public comment and review by the other Atlantic Councils. Concerned that commercial fishing in the EEZ was depleting billfish stocks and responding to the public's comments, the Atlantic Councils continued to work on developing ways for managing the billfish resource. In 1982, they requested an advance review by the National Marine Fisheries Service ("NMFS"), the sub-agency to whom the Secretary has delegated principal responsibility for developing and implementing regulations under the Magnuson Act. The Atlantic Councils made further changes to the FMP in response to NMFS' comments and in 1985 received further reports of low levels of abundance in the billfish stock. *See* AR App. Vol. III, 1985.2 at 1. In 1987, extensive public hearings

were held throughout the United States, and the Atlantic Councils again received numerous written comments. Finally, after the Atlantic Councils and then the Secretary approved the FMP, the final rule implementing the FMP, along with responses to comments, were published in September 1988.

The purposes of the final rule are to: (1) "reduce fishing mortality on billfish"; (2) "maintain the highest availability of billfish to the U.S. recreational fishery"; (3) "optimize the social and economic benefits to the Nation by reserving the billfish resource for the U.S. recreational fishery"; and (4) "increase understanding of the condition of the billfish stock and the billfish fishery." 53 Fed.Reg. 37,765 (1988). Moreover, recognizing the highly migratory nature of billfish, the FMP establishes "management units" for each of the four species of billfish which extend far beyond the EEZ to include much of the Atlantic Ocean. Although the Secretary's regulations implement several other management measures contained in the FMP, the plaintiffs on behalf of commercial fishermen challenge only the following measures: (1) "The possession or retention [within the Atlantic Ocean EEZ] of a billfish by a vessel with a pelagic longline or drift net aboard is prohibited," 50 C.F.R. § 644.22(b) (1988) (hereinafter "no possession provision"); (2) "A billfish harvested from its management unit may not be purchased, bartered, traded, or sold in any State," § 644.24(a) (hereinafter "no sale provision"); and (3) in most instances, seafood dealers and processors must have certain documentation for any billfish in their possession to show that it was not harvested from its management unit, § 644.24(b) (hereinafter "paper trail provision").[6]

---

**5.** In addition to the South Atlantic Council, the other four Councils with jurisdiction over parts of the Atlantic Coast EEZ that were involved in preparing the billfish FMP are the New England, Mid–Atlantic, Gulf of Mexico, and Caribbean Councils.

**6.** The regulations contain other measures that the plaintiffs do not challenge, including provision which: (1) require certain persons conduct-

ing billfish tournaments to submit data reports, 50 C.F.R. § 644.5 (1988); (2) prohibit any fishermen, commercial or recreational, from possessing a billfish less than the specified minimum size limit, §§ 644.7, 644.21; and (3) prohibit possession or retention in the EEZ of any billfish harvested by gear other than rod and reel, § 644.22(a).

## II. ANALYSIS

Attacking the billfish FMP on two broad fronts, the plaintiffs argue first that the Secretary exceeded his authority under the Magnuson Act and second that, even if he had the authority to promulgate these regulations, they are not adequately supported by the record. The Court will consider and reject both of these challenges in turn.

### (A) Scope of Secretary's Authority

An important threshold question is what standard of review the Court should apply in evaluating the scope of the Secretary's authority under the Magnuson Act. The plaintiffs contend that whether an agency has acted within its lawfully delegated power is a question of statutory construction subject to *de novo* judicial review. The Court disagrees.

■ It is true, as the plaintiffs argue, that "[t]he judiciary is the final arbiter on issues of statutory construction." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) (quoting *Chevron, USA, v. Natural Resources Defense Council*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984)). However, the plaintiffs emphasize only the tip of iceberg. In the very same paragraph, the *Cardoza–Fonseca* Court stated that the judiciary "must reject administrative constructions which are contrary to *clear* congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention *on the precise question at issue*, that intention is law and must be given effect." *Id.* 480 U.S. at 447–48, 107 S.Ct. at 1221–22 (emphasis added) (quoting *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9). On the other hand, when congressional intent is not clear, the judiciary's review of an administrative construction is much more deferential. "[W]here the statute is silent or ambiguous *with respect to the specific issue*, the question for the court is whether the agency's answer is based on a *permissible construction* of the statute." *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987) (emphasis added) (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781). Thus, the Court must determine the standard of review on an issue-by-issue basis, deciding whether the Magnuson Act is clear or whether it is silent or ambiguous as to each of the plaintiffs' challenges.

According to the plaintiffs, the Secretary overstepped the bounds of his authority under the Magnuson Act in three significant respects. First, they contend that the no possession provision is invalid because it applies to billfish caught beyond the EEZ whereas the Magnuson Act only authorizes regulation within the EEZ. The plaintiffs' second argument is that the Act does not authorize the type of marketplace regulation imposed by the no sale provision. Finally, the plaintiffs claim that the Magnuson Act does not authorize the five Councils, whose jurisdiction is limited to part of the Atlantic Ocean, to apply documentation requirements like the paper trail provision to billfish caught in the Pacific Ocean.

### (1) No Possession Provision

■ The Magnuson Act delineates the federal government's jurisdiction over billfish as follows: "[T]he United States claims, and will exercise ..., sovereign rights and exclusive fishery management authority over all fish ... within the [EEZ]." 16 U.S.C. § 1811(a) (West Supp. 1989). However, neither this nor any other section of the Act reveals whether the phrase "all fish within the EEZ" means that the Secretary's authority applies only to fish *harvested* within the EEZ (as the plaintiffs argue) or to fish *located* within the EEZ no matter where they were harvested (as the Secretary contends). Both of these interpretations are plausible. Thus, since the Act is at best ambiguous as to whether the no possession provision is an invalid "extraterritorial" expansion of the Secretary's power under the Act, the Court will defer to the Secretary's interpretation if it is a "permissible" construction of the Act. *See United Food & Commercial Workers Union*, 484 U.S. at 123, 108 S.Ct. at 420.

The plaintiffs may be technically correct in arguing that the no possession provision

"indirectly regulates" fishing that occurs beyond the EEZ in the Atlantic Ocean. But that alone is not dispositive because the issue is whether interpreting the Magnuson Act to authorize such indirect regulation is a permissible construction of the statute. The Court holds that it is. The Secretary's no possession provision applies only to United States vessels located *within* the Atlantic Ocean EEZ, regulating "possession of billfish by a vessel of the United States shoreward of the outer boundary of the EEZ." 50 C.F.R. § 644.1(b) (1988). Moreover, Congress specifically delegated to the Secretary the authority to promulgate such regulations as are "necessary" to implement an approved FMP. 16 U.S.C. § 1855(c), (g).

Notwithstanding the plaintiffs' protestations to the contrary, the no possession provision is not an "extraterritorial" application of a United States statute.[7] The United States Court of Appeals for this Circuit stated, "It has long been settled law that a country can regulate conduct occurring outside its territory which causes harmful results within its territory," *Laker Airways v. Sabena, Belgian World Airlines,* 731 F.2d 909, 922 (D.C.Cir.1984), and emphasized that "[t]he territorial effects doctrine is *not* an *extraterritorial* assertion of jurisdiction," *id.* at 923 (emphasis in original). Applying only to United States vessels located within United States territory, the no possession provision does not assert extraterritorial jurisdiction. Therefore, the cases that the plaintiffs cite for the presumption against applying a federal statute beyond the United States' jurisdiction are inapposite.

There are several activities beyond the Atlantic Ocean EEZ which the no possession provision does not prohibit. As long as a commercial fishing vessel is not within the Atlantic Ocean EEZ, its fishermen may retain any billfish they catch and: (1) keep them on board; (2) cook and consume them; (3) off-load them to another boat, either foreign or domestic; or (4) sail to a foreign port (without entering the Atlantic Ocean EEZ) and sell the billfish abroad. Merely because the no possession provision forecloses the one activity that the plaintiffs regard as most desirable—returning to domestic ports with the billfish they have caught—does not mean that the regulation is invalid as an extraterritorial application of United States law. The FMP forbids a certain class of fishing vessels, *whenever they are located within the Atlantic Ocean EEZ,* from possessing billfish. In the absence of any clear indication by Congress to the contrary, the Court holds that this construction of the Secretary's authority under the Magnuson Act is permissible.

(2) No Sale Provision

■ Similarly, the Court is not persuaded by the plaintiffs' argument that the FMP's no sale provision is "marketplace regulation" not authorized under the Magnuson Act. Once again, the parties disagree on how to interpret part of the Act about which congressional intent is unclear. Therefore, the Court must determine whether the Secretary's construction is permissible. *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987).

In essence, the plaintiffs argue that nowhere in the Magnuson Act or in its legislative history did Congress indicate that the Secretary may regulate the sale of legally-caught fish. The plaintiffs argue that the structure of 16 U.S.C. § 1857, which contains the only sale prohibition reference in the Magnuson Act, specifically supports their position. In addition to a general prohibition against violations of "any provision of [the Act] or any regulation ... issued pursuant to [the Act]," § 1857(1)(A), this section contains a more specific provision making it unlawful for any person "to ship, transport, offer for sale, sell, pur-

7. Because the Court holds that the Secretary's no possession provision is not an extraterritorial application of United States law, the Court does not reach the question, raised by the defendant-intervenors, of whether the Magnuson Act vests the Secretary with authority to directly regulate billfish throughout their geographic zone and regulate fishing by United States citizens anywhere in the world.

chase, import, export, or have custody, control, or possession of, any fish taken or retained in violation of [the Act] or any regulation ... [issued pursuant to the Act]," § 1857(1)(G). The plaintiffs contend that the more specific (1)(G) prohibition limits the Secretary's general authority under (1)(A) and that the no sale provision would "swallow up" the specific prohibition.

The Court disagrees with this cramped interpretation of § 1857. The Magnuson Act vests broad authority in the Secretary to promulgate such regulations as are necessary to carry out the conservation and management measures of an approved FMP. *See* 16 U.S.C. §§ 1855(c), (g), 1827(g), 1853(a)(1)(A); *see also Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989); *Lovgren v. Byrne*, 787 F.2d 857, 864 (3d Cir.1986). Moreover, § 1857(1)(A) makes it unlawful for any person to violate *any* regulation issued pursuant to the Magnuson Act. Merely because Congress chose to also specify certain actions as unlawful *per se* in § 1857(1)(B)–(I) does not mean that it intended those prohibitions to be the boundaries of the Secretary's broad rulemaking authority.

> Indeed, to conclude otherwise would be contrary to the Supreme Court's long-standing view that it is not "a reasonable canon of interpretation [to assume] that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected."

*Lincoln Savings & Loan Ass'n v. Federal Home Loan Bank Bd.*, 856 F.2d 1558, 1562 (D.C.Cir.1988) (quoting *American Trucking Ass'ns v. United States*, 344 U.S. 298, 309–10, 73 S.Ct. 307, 314–15, 97 L.Ed. 337

(1953)); *see also In re Permanent Surface Mining Regulation Litigation*, 653 F.2d 514, 523–24 (D.C.Cir.1981) (appellant's proposition that "the existence of specific grants must eviscerate a general grant of rulemaking power ... cannot be squared with ... Supreme Court decisions relying on general rulemaking grants to uphold rulemaking authority despite the presence of specific grants in the statutes scrutinized" (citing cases)), *cert. denied*, 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981).

The billfish FMP's no sale provision is not "pure marketplace regulation," as the plaintiffs contend, but is instead a conservation measure that applies to any billfish harvested from within its management unit and applies to both recreational and commercial fishermen. The plaintiffs concede, as they must, that the Magnuson Act is a resource conservation statute. The Secretary has determined that the billfish resource must be conserved and that one way to achieve the objective of maintaining "the highest availability of billfish to the U.S. recreational fishery," 50 Fed.Reg. 37,765 (1988), is to prevent the development of a commercial billfish market. Assuming this decision is correct,[8] a provision that prevents the sale of all billfish harvested within their management units in the Atlantic Ocean, whether caught inside or outside the Atlantic Ocean EEZ, is necessary to avoid a huge enforcement loophole. Without the no sale provision, any person attempting to sell a billfish in the United States could simply claim that it was harvested beyond the Atlantic Ocean EEZ. In view of the Secretary's broad rulemaking authority under the Magnuson Act and in the absence of any clear congressional pronouncement to the contrary,[9] the Court

---

**8.** Whether the administrative record adequately supports this decision is a separate issue that the Court addresses below in section (B).

**9.** The plaintiffs rely greatly upon the remarks of Senator Stevens, one of the principal sponsors of the Magnuson Act, who stated: "We have no intention to permit the regional council[s] to have economic authority over fisheries resources. They are to have conservation and environmental authority, but not economic." 122 Cong.Rec. 685 (1976). However, the impact of these statements on the instant issue becomes

much more equivocal when they are not quoted out of context. Senator Stevens was proposing and explaining an amendment that added the "except" clause to "national standard 5": "Conservation and management measures shall, where practicable, promote efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its *sole* purpose." 16 U.S.C. § 1851(a)(5) (emphasis added). Moreover, just a few lines before making the statements quoted above, Senator Stevens said, "The intent of this amendment

cannot conclude that the Secretary's construction of the Act was impermissible or that he exceeded his authority by promulgating the no sale provision.[10]

(3) Paper Trail Provision

■ On this closely related issue, the plaintiffs argue that the Magnuson Act also does not authorize the Secretary's decision to promulgate the paper trail provision, which requires:

> [e]xcept for a billfish landed in a Pacific State and remaining in the State of landing, a billfish that is possessed by a seafood dealer or processor will be presumed to have been harvested from its management unit unless it is accompanied by documentation [specified in this section] that it was harvested from outside its management unit.

50 C.F.R. § 644.24(b) (1988). When combined with the no sale provision discussed previously, the paper trail provision forces seafood dealers and processors, in most instances, to either forego selling any billfish whatsoever or document that each billfish they possess was harvested from somewhere other than its management unit in the Atlantic Ocean.[11] The plaintiffs complain that, by promulgating the paper trail provision, the Secretary is in effect improperly regulating the Pacific Coast billfish fishery to implement a policy that the Atlantic Councils have deemed desirable.

Again, because congressional intent is not clear on this precise issue, the question for the Court is whether the Secretary's interpretation is permissible. *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987).

The plaintiffs' first salvo in their attack on the paper trail provision—that the five Atlantic Councils do not have jurisdiction to regulate billfish off the Pacific Coast— misses the mark. Since the Magnuson Act requires that the *Secretary's* regulations are subject to judicial review, 16 U.S.C. § 1855(d), the Court must concern itself with the Secretary's authority and not with the actions of the five Atlantic Councils. *See Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1464 (9th Cir.1987). On this issue, the Atlantic Councils' jurisdiction is unimportant because the Magnuson Act vests the Secretary, on behalf of the federal government, with jurisdiction over fishing activity within all parts of the EEZ, *see* 16 U.S.C. § 1811(a) (West Supp. 1989), whether off of the Atlantic or Pacific Coast.

---

is to make certain that those management and conservation measures [referred to in national standard 5] shall not be for the *sole* purpose of economic allocation of the fishery resources." 122 Cong.Rec. 685 (1976) (emphasis added). Thus, it is not at all clear that Senator Stevens' statements—when subjected to closer scrutiny— ruled out a measure such as the no sale provision, as long as its purpose is not solely economic.

**10.** In addition, initially in a footnote and then in their reply, the plaintiffs briefly raised the issue of whether the no sale provision—which arguably restricts imports—violates the United States' obligations under the General Agreement of Tariffs and Trades ("GATT"), October 14, 1947, T.I.A.S. No. 1700, 61 Stat. Parts 5–6 (1947). The Court need not resolve the disputes between the parties over whether the plaintiffs ever properly raised a GATT-based claim, whether they have standing to raise this issue, and whether this Court even has jurisdiction to decide such a claim. Assuming *arguendo* that the foregoing issues were resolved in the plaintiffs' favor, they have, in any event, failed to state a claim because GATT contains two specific exceptions to the general rule against trade barriers. Import restrictions may be imposed: (i) on agricultural and fisheries products when necessary to enforce domestic restrictions on like products, *see* GATT Art. XI(2)(c), and (ii) to conserve an exhaustible natural resource if domestic consumption is also restricted, *see* GATT Art. XX(I)(g).

**11.** It should be noted that the billfish management situation off the Pacific Coast is different from its counterpart off the Atlantic Coast.

> [B]iological conservation is a more meaningful objective for the Atlantic and Gulf Coast fisheries than it is in the central and western Pacific. Billfish stocks in the Atlantic and Gulf can be affected by foreign and domestic fishery effort within the [EEZ] along these coasts. In the [EEZ] of the western and central Pacific, fishing effort probably has little if any measurable influence on the overall abundance of billfish (only 1.3 percent of the total Pacific catch is taken in the [EEZ]).

AR App. Vol. II, 1982.1 at 4. That explains the exception in the paper trail provision for billfish landed in a Pacific Coast state and remaining in the state of landing.

The plaintiffs' second salvo—that the Magnuson Act does not authorize the Secretary to regulate Pacific billfish merely because they look like Atlantic billfish—also fails to bring down the paper trail provision. There is a good reason why the no sale and paper trail provisions are part of the same section of the billfish regulations. *See* 50 C.F.R. § 644.24(a), (b) (1988). Together these two provisions address billfish conservation concerns by attempting to prevent the development of a commercial market for Atlantic billfish. The former provision prohibits the sale in the United States of any billfish harvested from its Atlantic Ocean management unit while the latter makes seafood dealers and processors responsible for documenting that all billfish in their possession were harvested outside of their management units.

Both provisions are designed to avoid a problematic scenario: in their absence a commercial market for Atlantic billfish may develop and anybody selling a billfish could baldly assert that it was harvested from the Atlantic Ocean beyond the EEZ or, in the alternative, from the Pacific Ocean. Thus, the two provisions are so closely related that the presence of one without the other would be completely illogical. The plaintiffs, however, ignore these "real world" considerations facing the Secretary. Though conceding that the Magnuson Act is a conservation statute, they nevertheless attempt to hamper the Secretary's conservation efforts by preventing him from closing this broad regulatory loophole. It is not feasible for the Secretary to place an observer on board every United States commercial fishing vessel in the Atlantic Ocean that might catch a billfish merely for the purpose of ensuring that billfish from their management units do not enter the stream of commerce. Having already established the Secretary's authority to promulgate the no sale provision, the Court sees no reason why the Secretary's decision to require, in most instances, documentation for billfish is not a permissible construction of his authority under the Magnuson Act.

When viewed together, the no sale and paper trail provisions are, in two different ways, a less intrusive alternative to conserving the billfish resource. First, the no sale provision does not completely prohibit the selling of billfish in the United States. It helps conserve the Atlantic billfish resource yet does not unduly burden the commercial billfish market. As long as a billfish was harvested in the Atlantic Ocean beyond its management unit or in the Pacific Ocean, it may be sold in the United States. Second, the paper trail provision is narrowly tailored to reinforce the prohibition on the sale of billfish harvested from their Atlantic Ocean management units while at the same time facilitating the selling of all other properly documented billfish. Moreover, the Secretary specifically exempted from the documentation requirements any billfish landed in a Pacific Coast state and remaining in the state of landing. 50 C.F.R. § 644.24(b) (1988). Thus, he "fine-tuned" the paper trail provision, recognizing that lack of documentation for a billfish landed in a Pacific Coast state and not shipped interstate "would not create difficulty in enforcing the no-sale provision." 53 Fed.Reg. at 37,768.

In sum, the Court holds that the Secretary properly balanced various competing considerations in promulgating the paper trail provision. The paper trail provision is necessary for the enforcement of the no sale provision, which in turn is necessary, as discussed above, to conserve the Atlantic Coast billfish resource. The plaintiffs have not demonstrated to the Court that the Secretary, by promulgating the paper trail provision, impermissibly misconstrued the Magnuson Act or overstepped the bounds of his broad rulemaking authority under the Act.

*(B) Adequate Support in Administrative Record*

■ Having determined that the challenged regulations implementing the billfish FMP do not exceed the Secretary's Magnuson Act authority, the Court must now review the Secretary's decision to promulgate those regulations in light of the administrative record before him. On this issue, the Magnuson Act requires the

Court to apply the traditional APA deferential standard of review, 16 U.S.C. § 1855(d), invalidating the regulations only if the Secretary's decision was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see Alaska Factory Trawler Ass'n v. Baldridge,* 831 F.2d 1456, 1460 (9th Cir.1987); *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977); *Associated Vessels Servs., Inc. v. Verity,* 688 F.Supp. 13, 17 (D.D.C.1988). This means that the Secretary's actions are presumed valid and that the Court may not simply substitute its own judgment for that of the Secretary. *See Environmental Defense Fund v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981).

The plaintiffs criticize the adequacy of the administrative record in three basic ways. They argue that the first objective of Magnuson Act regulation must be conservation of the fishery resource and that this record does not support such a conservation justification. Second, the plaintiffs contend that, even if it were permissible under the Act for an FMP to take economic and social benefits into account, this record does not provide such a justification for the Secretary's measures. Finally, the plaintiffs claim that the billfish management measures are inconsistent with the "national standards" that the Magnuson Act establishes. *See* 16 U.S.C. § 1851.

### (1) Conservation Justification

■ The plaintiffs correctly note that conservation of a fishery resource is an important justification for any regulation under the Act. *See, e.g.,* §§ 1801(b), 1802(2), 1851, 1853(a)(1). But the Court does not agree with their argument that conservation is the *only* factor that the Secretary may consider in promulgating Magnuson Act regulations. The term "conservation and management" appears repeatedly throughout the Act and is defined, in relevant part, as:

all of the rules, regulations, conditions, methods, and other measures (A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery re-

source and the marine environment; and (B) which are designed to assure that—
(i) a supply of food and other products may be taken, *and that recreational benefits may be obtained, on a continuing basis;* ...

16 U.S.C. § 1802(2) (emphasis added). Thus, the Act's plain language envisions that, while conservation of the fishery resource is important, the Secretary may also consider other factors. *See* § 1801(a)(6) (emphasis added) ("A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, *and to realize the full potential of the Nation's fishery resources.*"). Moreover, this conclusion comports with a common sense construction of the term "conservation and management," in which the two words do not have synonymous and redundant meanings. In light of the term's prevalence throughout the Act, the Court does not believe that Congress intended the "management" part of it to be mere surplusage.

■ However, even assuming *arguendo* that conservation is the *only* proper objective of any Magnuson Act regulation, the plaintiffs have not met their burden of proving that the record is so devoid of conservation justifications that the Secretary's decision to approve the billfish regulations was arbitrary or capricious. As the record reflects, the Councils gathered and considered evidence that the billfish resource was being overfished. One relatively recent report of an international fisheries organization indicated that preliminary estimates of 1983 blue marlin landings "showed a substantial decline"; that the 1973–79 trend for white marlin landings was negative and, despite a slight upward trend in 1979, was "still rather low"; and that there was some conflicting evidence that sailfish were overfished. AR App. Vol. III, 1985.2 at 1. The record contains other data also suggesting a decrease in the billfish stock. *See* 53 Fed.Reg. at 37,-768 (although extrapolated values may tend to overestimate, they "indicate that incidental billfish catch by the longline

fleet could be more than twice as large as the estimated total recreational catch"); AR App. Vol. I, FMP Source Doc. at 5–22, 5–23 (billfish tournament catch rates in mid-Atlantic region show "dramatic decline").

The plaintiffs criticize the quality of this evidence, arguing that it is inconclusive and not sufficient to justify the FMP. The record reveals that the Secretary and the Councils were aware of the limitations on their billfish stock data due to the inherent difficulty of obtaining absolutely precise information about these highly migratory, widely dispersed species of fish.[12] See 53 Fed.Reg. at 37,766; AR App. Vol. I, Decision Memorandum at Appendix A ¶ 1. However, the Magnuson Act does not force the Secretary and Councils to sit idly by, powerless to conserve and manage a fishery resource, simply because they are somewhat uncertain about the accuracy of relevant information. Instead, one of the Act's national standards requires that "[c]onservation and management measures shall be based upon the best scientific information *available.*" 16 U.S.C. § 1851(a)(2) (emphasis added); *see also* 50 C.F.R. § 602.12(b) (1987) (emphasis added) ("The fact that scientific information concerning a fishery is incomplete *does not* prevent the preparation and implementation of an FMP."). Consequently, the Court will not construe the Magnuson Act to tie the Secretary's hands and prevent him from conserving a given species of fish whenever its very nature prevents the collection of complete scientific information. The record before the Court sufficiently supports the Councils' and the Secretary's conclusion, based on the best scientific information available to them, that the billfish resource was overfished and in need of conservation.

Furthermore, the record demonstrates that the Councils and the Secretary acted to conserve the dwindling billfish resource, affecting both recreational and commercial fishing interests in the process. For example, the Secretary's regulations include a provision requiring recreational fishermen to release any billfish below a certain minimum size. 50 C.F.R. §§ 644.7(b), 644.21 (1988). Moreover, the regulations require that, when caught, these undersized billfish "must be released by cutting the line near the hook without removing the fish from the water," § 644.21(b), and also specify that billfish taken as incidental by-catch inside the EEZ by gear other than rod and reel "must be released in a manner that will ensure maximum probability of survival," § 644.23.[13]

The FMP's first objective, among those listed in the regulations, is to "[m]aintain the highest availability of billfish to the U.S. recreational fishery *by implementing conservation measures that will reduce fishing mortality.*" 53 Fed.Reg. 37,765 (1988) (emphasis added). Thus, the FMP contains the no possession provision to reduce as much as possible billfish mortality incident to commercial fishing activity directed at other species of fish. In addition, concerned about the negative impact of a developing domestic billfish market on the abundance of the resource,[14] the Councils

---

**12.** Recognizing the importance of continuing to obtain much-needed information about the billfish resource, the Councils included in the FMP, and the Secretary approved, a record-keeping and reporting provision. *See* 50 C.F.R. § 644.5 (1988). This provision (which is entirely separate from the paper trail provision challenged by the plaintiffs) enables NMFS to require any person conducting a billfish tournament along the Atlantic Coast and the Gulf of Mexico to maintain during, and submit upon conclusion of, the tournament a highly detailed fishing record form. This record-keeping provision, by definition, affects only recreational fishermen and calls into question the plaintiffs' repeated assertions that the billfish regulations' burdens fall exclusively upon commercial fishermen.

**13.** In addition, although the FMP, to accommodate other objectives, rejected the alternative of requiring that all billfish tournaments adopt the so-called "no kill" format, it does contain a forceful warning to recreational billfish fishermen: "[T]he Councils strongly recommend that all tournaments adopt the no kill format, and if the present trend towards no kill tournaments does not continue, the Councils will reconsider this alternative in the first amendment but in no case later than 2 years after implementation of the [FMP]." AR App. Vol. I, FMP at 69.

**14.** The plaintiffs concede that "prior to the implementation of the FMP, there was a small *but growing* commercial market for billfish in the United States." Plaintiffs' Memorandum of

developed, and the Secretary implemented, the no sale provision which applies to commercial and recreational fishermen. Finally, the FMP includes the paper trail provision in recognition of the reality that the no sale provision—and its attendant conservation effect—would be completely diluted absent an effective method for determining whether a billfish was harvested from within its management unit.

Viewed as a whole, the FMP's conservation and management measures—whether challenged by the plaintiffs or not [15]—demonstrate that the Secretary and the Councils were greatly concerned with reducing billfish mortality and conserving the billfish resource. *See e.g.*, AR App. Vol. IV, 1988.29 at 2 ("Release of billfish by [commercial fishermen] and of small billfish by recreation[al] fishermen will clearly increase the average size of the billfish population."). The FMP enables billfish to attain sexual maturity and gives them opportunity to reproduce before being harvested. 53 Fed.Reg. at 37,767; *see* AR App. Vol. I, FMP at 49–58. In fact, the record reflects that the Councils chose the minimum size limits specifically to reduce the mortality rates of those billfish species most in need of conservation by between thirty and fifty percent. AR App. Vol. I, FMP at 50. Furthermore, while acknowledging that the no possession provision would result in some

waste (by forcing commercial fishermen to discard dead billfish), the FMP correctly concludes that the provision would nevertheless promote conservation, because approximately 59% of the billfish caught by longline fishermen are alive when brought on board. *Id.* at 58–59. Even assuming, as the plaintiffs claim, that this figure is somewhat inflated, the Court cannot hold that there is no adequate conservation justification on this record for the no possession provision.[16]

Nor does this Court's conclusion that there is a sufficient conservation justification for the Secretary's billfish regulations waver in the face of the plaintiffs' argument that—due to the extensive nature of the foreign billfish harvest from beyond the EEZ—only international management measures would have any effect on the billfish resource.[17] Merely because billfish are also harvested beyond the EEZ is no reason why the Secretary should not regulate them within the bounds of his authority under the Act. When Congress passed the Magnuson Act it was well aware of the existence of international fishery management agreements, especially the one that the plaintiffs specifically mention, the International Convention for the Conservation of Atlantic Tunas. *See* 16 U.S.C. § 1827(b)(1)(B); *see also* § 1801(b)(2), (c)(5). Moreover, Congress explicitly recognized

---

Points and Authorities in Support of Motion for Summary Judgment at 9 (emphasis added).

**15.** The Court will not ignore certain conservation and management measures, as the plaintiffs urge, simply because the plaintiffs have not challenged these parts of the FMP. By only considering isolated provisions in a vacuum, the Court cannot determine whether the Secretary's decision to implement this *comprehensive* FMP was arbitrary or capricious, especially when—as is the case here—other provisions are highly relevant to the issues before the Court.

**16.** Under these circumstances, the Court does not comprehend how the no possession provision, which in effect enables one out of every two billfish caught by commercial fishermen to survive, could have anything but a beneficial impact on the abundance of the billfish fishery. In addition to this obvious benefit, the no possession provision closes a potential enforcement loophole because—short of stationing an observer on board of every commercial fishing ves-

sel—there is no way for the Secretary to determine whether billfish possessed by commercial fishermen were initially alive or dead when caught. Therefore, the alternative of requiring commercial fishermen to release only billfish that are alive when brought on board would not only be unenforceable but would create an incentive for those commercial fishermen intent on retaining as many billfish as possible to kill the billfish they catch rather than releasing them alive. In sum, although the no possession provision will cause some waste whenever a dead billfish is thrown away, the Court agrees with the Secretary's conclusion that, on the whole, the provision will contribute significantly to conserving the billfish resource.

**17.** By conceding that the Secretary's regulations would have no impact on foreign fishing activity beyond the EEZ, the plaintiffs underscore the weakness of their other contention, *see* discussion *supra* Part II(A)(1) at 8–11, that the regulations are an invalid extraterritorial extension of the Secretary's Magnuson Act authority.

the problems associated with "massive foreign fishing fleets," § 1801(a)(3), and found that "[i]nternational fishery agreements have not been effective in preventing or terminating the overfishing of ... valuable fishery resources. There is danger that irreversible effects from overfishing will take place before an effective international agreement on fishery management jurisdiction can be negotiated, signed, ratified, and implemented," § 1801(a)(4). The plaintiffs point to nothing indicating that Congress intended to preclude the Secretary from implementing management and conservation measures whenever a species of fish was subject to foreign as well as domestic harvest within and beyond the EEZ.

(2) Economic and Social Considerations

■ While the Secretary, when contemplating whether to approve an FMP, should certainly take economic considerations into account, the Magnuson Act is clear on its face that the Secretary is not limited to conducting a strict economic cost/benefit analysis but should also engage in a more qualitative analysis of the relevant social factors. Congress specifically required the Secretary to manage fishery resources to "provide the greatest *overall* benefit to the Nation, with particular reference to food production and *recreational opportunities*" and to modify the biological figure (maximum sustainable yield) "by any relevant economic, *social,* or ecological factors." § 1802(18) (emphasis added); *see* § 1853 (any FMP must contain description of fishery including, *inter alia,* "any recreational interests in the fishery"); *see also* 50 C.F.R. § 602.11(e)(2) (one of two values that should receive "serious attention" in determining greatest benefit to nation is "recreational opportunities," which "includes recognition of the importance of the quality of the recreational fishing experience"). As the Ninth Circuit held in the analogous context of reviewing an amendment to an FMP:

> The Secretary does not have to conduct a formal cost/benefit analysis of [the amendment]. He, therefore, does not need to demonstrate that it is the least restrictive alternative available for managing the sablefish resource. The Secretary could reasonably have concluded from the record that pot and trawl fishing should be curtailed in Alaska for both *sociological* and environmental reasons, and that the amendment would be *beneficial to the nation as a whole, even though some interest groups might be harmed.*

*Alaska Factory Trawler Ass'n v. Baldridge,* 831 F.2d 1456, 1460 (9th Cir.1987) (emphasis added); *see Pacific Coast Fed'n of Fishermen's Ass'n v. Secretary of Commerce,* 494 F.Supp. 626, 631 (N.D.Cal.1980) (emphasis added) ("[H]aving considered the economic impact, the Council is free to adopt a[n FMP]. *It need not undertake a rigorous exercise in microeconomic analysis.*").

Similarly, the Court cannot conclude that the administrative record is so devoid of quantitative economic and qualitative social justifications that the Secretary's decision to approve the FMP was arbitrary or capricious. The Councils, as well as Congress, recognized that billfish occupy a unique position in this country in that they have little or no commercial value (in terms of food production) but are highly prized by countless recreational fishermen merely for the experience of catching, or attempting to catch, one of these fish. *See* AR App. Vol. I, FMP at 20, 35. For example, "[p]articipants in this fishery are willing to spend large sums of money ... and time in the fishery even though the catch per unit of effort is extremely low in comparison with that in other marine recreational fisheries." *Id.* at 34. In 1978 the billfish fishery provided an estimated one million days of recreation for approximately 66,000 people, generating direct expenditures of about $100 million, or about $1,300 per fish caught. *Id.* at 36. It is likely that the total value of the recreational billfish fishery—and its concomitant impact on the economies of many coastal communities—is greater today than it was in 1978.

On the other hand, commercial fishermen catch billfish only as a by-product of their fishing activities directed at tuna and swordfish. In 1986 the estimated ex-vessel

value of billfish caught by longline fishermen was about $134,000, which represented only 0.4 percent of the value of their entire catch. *Id.* at 29, 33; AR App. Vol. I, FMP Source Doc. at 8–15 & Table 8–4. The FMP correctly notes that the valuation figures for the recreational and commercial billfish fisheries cannot be compared directly, but it also correctly observes that these figures "provide some indication of the considerable difference in relative value of [billfish] to the two user groups." AR App. Vol. I, FMP at 34. Furthermore, it is estimated that in 1983 the total recreational catch of marlin (blue and white) was about 10,100, *id.* at 24, Table 2,[18] whereas extrapolations based on observer data from 1985–1987 indicate that longline fleets caught about 37,000 marlin, *id.* at 22–23. Even if the latter figure were greatly reduced to compensate for the difference in years covered by the data and for possible distortions due to the concentration of observer effort in the southern region of the fishery, these statistics reveal that commercial fishermen catch far more billfish than recreational fishermen. In light of the data discussed above and other less quantifiable considerations,[19] the Secretary could properly conclude that, on the whole, the nation would benefit most from an effort to reduce billfish mortality caused by commercial fishing and maximize billfish availability for recreational fishing.

The Court recognizes—and takes very seriously—its duty to engage in a "thorough, probing, in-depth review" and conduct a "searching and careful" inquiry, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 416, 91 S.Ct. 814, 823, 824, 28 L.Ed.2d 136 (1971), into the Secretary's decision to implement the FMP. However, "the ultimate standard of review is a narrow one [, and] [t]he Court is not empowered to substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. at 824; *see Maine v. Kreps*, 563 F.2d 1052,

1055 (1st Cir.1977) ("A reviewing court ... may not substitute its own judgment as to values and priorities for that of the Secretary.").

Thus, whether the Councils' two "cost/benefit scenarios" support the FMP or are flawed, as the plaintiffs argue, is not dispositive. *See Michigan Consol. Gas Co. v. Federal Energy Regulatory Comm'n*, 883 F.2d 117, 123 (D.C.Cir.1989) ("Whether FERC's [competitive] model is 'faulty' or not, which we do not decide, we are not at liberty to replace FERC's economic reasoning, supported by its technical expertise, with our own."), *petition for cert. filed*, No. 89–1161 (Jan. 24, 1990). As a threshold matter, the Court has already held that the Magnuson Act does not require the Secretary to subject each FMP to a formal cost/benefit analysis. *Alaska Factory Trawler Ass'n*, 831 F.2d at 1460. Moreover, this question of whether certain billfish conservation and management measures would be in the nation's "best interest" is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh v. Oregon Natural Resources Council*, —— U.S. ——, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). It is therefore especially appropriate for the Court to defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors. *See Pittston Coal Group v. Sebben*, 488 U.S. 105, 109 S.Ct. 414, 438, 102 L.Ed.2d 408 (1988) ("[A]s an interpretive question becomes more technical, the expertise of the agency charged with a statute's administration becomes greater and deferring to its construction rather than importing our own becomes

---

18. Over fifty percent (or about 5,350) of these 10,100 marlin caught by recreational fishermen were released alive. AR App. Vol. I, FMP at 24, Table 2.

19. Regulatory "Guidelines" enacted pursuant to the Magnuson Act specifically provide that the

Secretary should consider factors that are not completely quantifiable, such as "the importance of the quality of the recreational fishing experience" and "contributions of recreational fishing to national, regional, and local economies." 50 C.F.R. § 602.11(e)(2)(ii) (1987).

more appropriate."); *see also Oregon Natural Resources Council,* 109 S.Ct. at 1861 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive.").

(3) Magnuson Act's National Standards

The Magnuson Act requires that any FMP, and any implementing regulations promulgated by the Secretary, must be consistent with seven "national standards for fishery conservation and management." 16 U.S.C. § 1851(a). The plaintiffs claim that the billfish FMP and the Secretary's regulations violate four of those national standards. The Court disagrees and will address each of the plaintiffs' arguments in turn.

■ National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."[20] § 1851(a)(1). The FMP defines optimum yield ("OY") for the fishery as "the greatest number of billfish that can be caught by the recreational fishery in the EEZ, *consistent with the provisions of this [FMP],* considering the biological limitations of the stock and the unavoidable incidental catches in other fisheries." AR App. Vol. I, FMP at 35 (emphasis added). Two of the plaintiffs' criticisms of this OY formulation overlap with issues

previously addressed and do not merit further extended discussion.[21]

The plaintiffs also argue that this specification of OY is fundamentally flawed because it is not derived from a concrete maximum sustainable yield ("MSY") figure. MSY is "the largest quantity of fish that can be harvested annually from a resource without reducing its long-term productive potential." *Id.* at ii. The plaintiffs' argument notwithstanding, the national standards guidelines—promulgated pursuant to the Magnuson Act's specific mandate, 16 U.S.C. § 1851(b)—recognize that under some circumstances defining a precise numerical MSY may be impossible:

> The determination of OY requires a specification of MSY. However, where sufficient scientific data as to the biological characteristics of the stock do not exist, ... or where frequent large-scale fluctuations in stock size make this concept of limited value, *the OY should not be based on a fabricated MSY but on the best scientific information available.*

50 C.F.R. § 602.11(c)(3) (1987) (emphasis added). The Court is not convinced that National Standard 1 nor any other part of the Magnuson Act require that, *in every instance,* the absence of a definite MSY figure invalidates an FMP. *See id.* § 602, Appendix A to Subpart B, Standard 1 (emphasis added) (guidelines recognize "that MSY represents the underlying biological rationale upon which *most* determinations of OY rest").

**20.** The Magnuson Act defines "optimum yield" as:

> the amount of fish—
> (A) which will provide the greatest overall benefit to the Nation, with particular reference to food production and recreational opportunities; and
> (B) which is prescribed as such on the basis of maximum sustainable yield from such fishery, as modified by any relevant economic, social, or ecological factor.
> 16 U.S.C. § 1802(18).

**21.** First, the plaintiffs argue that the FMP's definition of OY does not prevent "overfishing," because the vast majority of billfish are harvested beyond the EEZ by foreign vessels and because domestically the OY promotes the "maximum catch level" by recreational fishermen.

The Court has already held that the Magnuson Act does not require the Secretary to sit idly by whenever a large percentage of a fishery is harvested beyond the bounds of the Secretary's jurisdiction. *See supra* Part II(B)(1) at 26–27. In addition, the plaintiffs overstate the OY's domestic effect, failing to recognize—or acknowledge—that the OY specifically incorporates the FMP's provisions, one of which is the minimum size provision, 50 C.F.R. § 644.21 (1988), that reduces the catch level of recreational fishermen.

Second, the plaintiffs argue that the FMP violates National Standard 1 because the OY does not allocate the billfish resource to provide the greatest overall benefit to the nation. The Court already has carefully considered and rejected this argument. *See supra* Part II(B)(2) at 27–30.

Instead of fabricating a definite MSY figure—which would be of limited value in this case—the FMP candidly acknowledges that shortcomings in data on the billfish stock prevent anything other than "[provisional] estimates of MSY." AR App. Vol. I, FMP at 11. The FMP does estimate North Atlantic blue marlin MSY at about 2400–2500 metric tons and MSY of the entire Atlantic stock of sailfish and spearfish combined at about 2100 metric ton and uses 1000 metric tons as a "proxy" for the white marlin MSY. *Id.* Thus, merely because the Councils could not arrive at concrete numerical OY and MSY specifications for the billfish fishery by using the best scientific data available, does not mean that the FMP violates National Standard 1. *See* 50 C.F.R. § 602, Appendix A to Subpart B, Standard 1 (1987) ("The guidelines acknowledge ... that in some fisheries a numerical MSY is not essential in establishing an appropriate underlying biological basis for OY.").

National Standard 2 requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). The Court has already considered and rejected the plaintiffs' argument that the FMP is not based on the best scientific information available. *See supra* Part II(B)(1) at 21–23. Moreover, the guidelines for this national standard state unequivocally: "The fact that scientific information concerning a fishery is incomplete *does not* prevent the preparation and implementation of an FMP." 50 C.F.R. § 602.12(b) (1987) (emphasis added).

National Standard 4 provides:

If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). One of the plaintiffs' National Standard 4 arguments merits little additional discussion.[22]

The plaintiffs also contend that the FMP violates National Standard 4 because its allocation of billfish fishing privileges discriminates against commercial fishermen and is not "fair and equitable" to all billfish fishermen.[23] The Court disagrees. It should be noted that the provisions challenged by the plaintiffs are not facially discriminatory against commercial fishermen. They either make permissible distinctions based upon different types of fishing gear used, *see* 50 C.F.R. § 644.22 (1988) (no possession provision applies to vessels with pelagic longline or drift net aboard), or apply to both recreational and commercial fishermen, *see* § 644.24(a), (b) (no sale and paper trail provisions).

■ Merely because these provisions have a greater impact upon one type of gear user or group of fishermen does not necessarily mean that they violate National Standard 4. *See Alaska Factory Trawler Ass'n*, 831 F.2d at 1460 ("Even though there may be some discriminatory impact from the [FMP amendment], the regulations satisfy the requirements of National Standard 4 in that they are tailored to solve a gear conflict problem and to promote the conservation of sablefish."). The FMP's burdens also fall upon recreational fishermen: the minimum size provision greatly reduces the number of billfish that recreational fishermen may retain. 50 C.F.R. § 644.21 (1988). As the Court has repeatedly held today, the provisions challenged in this suit—and the ensuing advantages for recreational fishermen—are necessary and rationally related to the FMP's legitimate objective of conserving billfish

---

**22.** The Court has previously addressed at great length and rejected the plaintiffs' repeated contention that there is no conservation justification for the billfish FMP. *See supra* Part II(B)(1) at 20–27. It follows that the FMP is reasonably calculated to promote conservation as National Standard 4 requires.

**23.** The plaintiffs do not allege that the billfish FMP "discriminate[s] between residents of different States," 16 U.S.C. § 1851(a)(4), which is a separate prohibition of National Standard 4.

while also providing the greatest overall benefit to the nation. *See* 50 C.F.R. § 602.14(c) (1987) ("[a]n FMP may contain management measures that allocate fishing privileges if such measures are necessary or helpful in furthering legitimate objectives"); § 602.14(c)(3)(i)(B) ("An allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups."). Thus, the billfish FMP does not violate National Standard 4.[24]

■ Finally, National Standard 5 requires that "[c]onservation and management measures shall, *where practicable*, promote efficiency in the utilization of fishery resources." 16 U.S.C. § 1851(a)(5) (emphasis added). The plaintiffs argue that, by requiring commercial fishermen to discard dead billfish, the no possession and no sale provisions do not promote efficiency. As an initial matter, the plaintiffs' argument ignores the "where practicable" caveat of National Standard 5 and fails to recognize, as Congress did, that "there are certain instances in which maximum efficiency would be inappropriate. For instance, recreational fishing need not be made efficient, or much of the sport would be removed." S. Rep. No. 416, 94th Cong., 1st Sess. at 31 (1975). Efficiency is not of paramount importance in this case because the primary benefit of the billfish resource to the nation as a whole is recreational fishing opportunities and not food production, which (at least in the United States) is nothing more than a by-product of commercial fishing activities directed at other species.

Nevertheless, the plaintiffs focus their efficiency analysis too narrowly and fail to realize that the challenged provisions *do* promote efficiency. The guidelines for National Standard 5 state that "given a set of objectives for the fishery, an FMP should contain management measures that result in as efficient a fishery as is practicable or

desirable," 50 C.F.R. § 602.15(b)(1) (1987), and define efficiency as "the ability to produce a desired effect or product (or achieve an objective) with a minimum of effort, costs, or misuse of valuable biological and economic resources," § 602, Appendix A to Subpart B, Standard 5. The FMP before this Court achieves, with a minimum of cost, its objective of conserving billfish and maintaining the billfish resource for recreational purposes. The alternatives are neither desirable—such as not implementing the challenged provisions in the first place, which would defeat the FMP's objectives—nor practicable—such as placing an observer on board of every domestic commercial fishing vessel, which would be much more costly than discarding incidentally caught, dead billfish. Thus, the challenged provisions promote efficiency and are consistent with National Standard 5.

### III. CONCLUSION

The plaintiffs attack the validity of the Secretary's decision to implement the FMP by making what are, to a large extent, policy arguments on behalf of the interest group of commercial fishermen. Particularly relevant in this regard is slightly paraphrased language from the Supreme Court's *Chevron* opinion:

[The Secretary's decision to implement the FMP] represents a reasonable accommodation of manifestly competing interests and is entitled to deference: the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies....

... While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve,

---

24. The Councils carefully considered and ultimately *rejected the alternative of permitting* each commercial fishing vessel to retain and sell one billfish per trip because it was inconsistent with the FMP's objectives. FMP at 67. While this alternative would certainly reduce the

FMP's negative effect on commercial fishermen, it would also hamper the FMP's conservation objective. In any event, the Magnuson Act does not require the Secretary to select the least restrictive alternative. *Alaska Factory Trawler Ass'n*, 831 F.2d at 1460.

or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

... The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches."

*Chevron, USA v. Natural Resources Defense Council,* 467 U.S. 837, 865–66, 104 S.Ct. 2778, 2792–93, 81 L.Ed.2d 694 (1984) (citation and footnotes omitted).

Most, if not all, of the arguments that the plaintiffs have mounted in this forum against the Secretary's decision to implement the billfish FMP were raised repeatedly by them (as well as other individuals and entities) throughout the lengthy administrative process that preceded the Secretary's approval and implementation of the FMP. The Councils, and through them the Secretary, carefully considered but ultimately rejected these policy arguments. That the administrative record—spanning twelve years and consisting of 48 large loose-leaf binders—reflects a certain amount of disagreement among the countless individuals involved in developing or commenting on the FMP is inevitable and indicates that the debate was as open and vigorous as Congress intended.

The Magnuson Act grants the Secretary broad authority to promulgate regulations that are necessary and appropriate for the conservation and management of the nation's fishery resources. The Act also restricts this Court's role in reviewing the validity of the Secretary's decision. According the Secretary the proper degree of deference, the Court holds that the Secretary did not exceed the scope of his authority and did not impermissibly construe the Magnuson Act to authorize implementation of the no possession, no sale, and paper trail provisions. Furthermore, having determined that there is sufficient support in the record for the FMP's conservation and management measures, the Court concludes that the Secretary's decision to im-

plement the FMP was not arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

An Order in accordance with the foregoing Opinion will be issued of even date herewith.

## ORDER

In accordance with the Court's Opinion of even date herewith, it is, by the Court, this 12th day of March, 1990,

ORDERED that the defendant and defendant-intervenor's motions for summary judgment shall be, and hereby are, GRANTED; and it is further

ORDERED that the plaintiffs' motion for summary judgment shall be, and hereby is, DENIED; and it is further

ORDERED that the above-captioned case shall be, and hereby is, DISMISSED WITH PREJUDICE.